## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAVE-A-GATO, INC.
21 Caleta de las Monjas
San Juan, PR 00901-1575

     Plaintiff,

  v.

UNITED STATES NATIONAL PARK
SERVICE, an agency of the U.S.
Department of the Interior,
1849 C Street, N.W.
Washington, D.C. 20240,

JESSICA BOWRON, in her capacity as
Acting Director of the U.S. National Park
Service,
1849 C Street, N.W.
Washington, D.C. 20240,

DARRELL ECHOLS, in his capacity as the
Acting Regional Director of the South
Atlantic-Gulf region of the U.S. National
Park Service,
100 Alabama Street, S.W.
1924 Building
Atlanta, GA 30303,

DOUG BURGUM, in his capacity as U.S.
Secretary of the Interior,
1849 C Street, N.W.
Washington, D.C. 20240,

MYRNA PALFREY, in her capacity as
Superintendent of the San Juan National
501 Norzagaray Street
San Juan, PR 00901,
     Defendants.

No.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      This lawsuit is brought by Save-A-Gato, Inc. ("SAG")—a San Juan, Puerto Rico, non-profit organization whose mission is to provide for the health and well-being of San Juan's cats through the administration of a Trap-Neuter-Return ("TNR") program—in order to prevent the unlawful, misguided, and cruel roundup and likely extermination of scores of cats in Puerto Rico by the National Park Service ("NPS") in NPS' decision to end the existing TNR program at the Paseo Del Morro National Recreational Trail (the "Paseo") at the San Juan National Historic Site (the "Park").[1]

2.      Cats have lived in Puerto Rico for centuries and are a recognized and treasured part of its historic culture and contemporary community. These community cats[2] live throughout Old San Juan, including in and around the Paseo.

3.      Community cats have lived in the area that is now the Paseo long before the Paseo was constructed, and the cats are beloved by residents and tourists alike. Despite these facts, the NPS has arbitrarily decided to pursue an unattainable, unnecessary, and inhumane goal: the complete eradication of cats within the Paseo (the "2023 Plan").

4.      Prior to the 2023 Plan, NPS partnered with SAG for almost two decades to manage the health, welfare, and population of the community cats in the Paseo through a TNR program,

---

[1] There is an existing case challenging NPS's decision to end the existing TNR program at the Paseo in *Alley Cat Allies Incorporated v. U.S. National Park Service et al.,* Case No. 1:24-cv-876-RDM (D.D.C., Mar. 27, 2024) (the "*Alley Cat Allies* Case"). Plaintiff SAG previously sought to join the existing *Alley Cat Allies* Case. *See id.* at ECF No. 47. Now, pursuant to the Court's minute order in that case entered June 6, 2023, directing the Plaintiff (and proposed Plaintiff SAG) to file "an Amended Complaint or file a New Case on or before 6/13/2025," Plaintiff SAG brings this independent action. Plaintiff SAG intends for this case to relate to and be resolved with the *Alley Cat Allies* Case in the interest of judicial economy and efficiency.
[2] NPS's administrative materials refer to the community cats in the Paseo as "free-ranging" cats. The two terms are used interchangeably in this Amended Complaint.

whereby cats are trapped, neutered, eartipped, vaccinated and given veterinarian care, and returned to the Park. This program has improved the cats' lives and allowed them to thrive in their natural outdoor home in a community that cares about them.

5.      Now, NPS has arbitrarily decided it will terminate the TNR program and take "a phased approach to management of [community] cats, which will include continued trapping and removal efforts by an animal welfare organization [if one is found suitable, and otherwise by a removal agency], removal of all feeding stations in the park, monitoring, and additional removal efforts if deemed necessary." NPS will "euthanize"[3] or cause the "euthanasia" of any removed cats that are deemed unsuitable for adoption or that cannot be placed in animal shelters due to limited space. NPS claims the 2023 Plan is necessary to: 1) improve the safety of Park visitors and employees; 2) protect Park resources and reduce impacts to native wildlife species associated with "free-ranging cats"; 3) alleviate nuisance issues and align the visitor experience with the purpose of the Park; and 4) bring the Park into compliance with existing authorities for invasive species.

6.      As a preliminary matter, NPS lacks jurisdiction over the Paseo because the Paseo (and the associated designated National Recreation Trail that overlaps the Paseo) is outside of the Park boundaries, and NPS lacks authority to administer lands outside of the Park boundaries.  As such, the entire 2023 Plan is void and *ultra vires*, and should be deemed unlawful by this Court.

7.      Separately, NPS's espoused justifications for its 2023 Plan are transparently pretextual. NPS has provided no evidence that the community cats in the Paseo pose any danger to humans, has not demonstrated that the cats in the Paseo prey upon or harm any native species or wildlife, has not provided support for and appears to exaggerate the nuisance allegedly caused

---

[3] Euthanize/euthanasia is placed in quotations because an animal is only euthanized when they are suffering from being terminally ill or untreatably injured. Under NPS's Plan, healthy cats from the Paseo cats will be killed, not "euthanized."

by the cats, and makes no attempt to explain why existing authorities for managing invasive species—assuming the cats can be classified as an invasive species—are suddenly a paramount concern after nearly two decades of an active TNR program administered by Plaintiff SAG which has contributed to a harmonious coexistence between cats, the community, and tourists.

8.      In addition, NPS fails to acknowledge, much less address, the fact that removing the cats will not solve what NPS claims is a problem—*i.e.,* cats in the Paseo—because even with NPS's 2023 Plan, community cats will continue to live in the area surrounding the Paseo and frequent cat abandonments in and around the Paseo will continue to occur. While the cats in the Paseo are currently being fed, vaccinated, spayed or neutered, and treated with veterinary care, the new cats that will inevitably be introduced into the Paseo will not be. NPS's 2023 plan to remove the cats and discontinue the management plan will actually create and exacerbate problems.

9.      Moreover, in pursuit of its unattainable goal of ridding the Paseo of community cats, NPS utilized an arbitrary and flawed process that does not comply with the requirements of the National Environmental Policy Act ("NEPA") of 1969, 42 U.S.C. §§ 4321 *et seq.*, and arrived at a "solution" that will result in the needless killing of potentially hundreds of healthy cats. NPS attempts to appear as if it considered various alternatives for managing the community cat population within the Paseo, but, in reality, the stated purpose and justification of the project excluded any alternative besides removal.

10.      In developing the 2023 Plan, NPS failed to take the "hard look" at alternatives required by NEPA, and NPS's plan fails to account for, among other things, the practical realities of the Paseo; specifically, that the Paseo is situated in an urban area that is home to thousands of community cats and has a persistent cat-abandonment issue that requires active humane programs to curtail. While the number of cats across Old San Juan far outnumbers that currently in the Paseo,

4

NPS only has jurisdiction to remove the community cats within the Paseo itself, meaning (i) whatever issues NPS believes community cats are causing in the Paseo (which, for the reasons explained below, are either non-existent or being addressed by the TNR program) will continue to exist all around the site, and (ii) due to the "Vacuum Effect," the community cats removed from the Paseo are highly likely to be replaced by community cats from neighboring colonies. Therefore, the cats currently inhabiting the Paseo will be killed only to be replaced by cats who are less likely to have been spayed or neutered and vaccinated through a TNR program. The population will thus quickly rebound or even surpass the number of cats currently on the Paseo. And because TNR will be discontinued in favor of eradication, there will be no recourse against an endless cycle of removal and killing.

11.    Had NPS meaningfully considered alternatives as NEPA requires, it would have placed more emphasis on addressing the underlying cause of the growth in the cat population in the Paseo—abandonment by local residents and the growth of the broader community cat population in Old San Juan—and would have aimed its efforts at addressing and mitigating that issue, primarily by funding and improving the efficacy of the TNR program administered by Plaintiff SAG and currently underway at the Park and in Old San Juan.

12.    Simply put, NPS's 2023 Plan lacks the rational basis necessary to pass muster under NEPA because there is no rational way to do the impossible. The 2023 Plan is motivated by an obviously unattainable goal and justified by pretextual rationale, resulting in a 2023 Plan that mandates a course of action that is as inhumane as it is ineffective. Accordingly, NPS's 2023 Plan should be declared violative of both NEPA and the Administrative Procedure Act and NPS should be enjoined from removing and ultimately killing the community cats in the Paseo, at least until NPS has conducted and issued a supplemental Environmental Assessment or Environmental

Impact Statement, one that analyzes the site-specific impact of community cats within the Paseo and the environmental impact of ceasing the TNR program and removing cats from the Park.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and the Administrative Procedure Act, 5 U.S.C. §§ 701 – 706 ("APA") because this action arises under the federal laws of the United States and involves a final agency action.

14.     The Court may grant relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202, and 5 U.S.C. §§ 701 – 706.

15.     There exists between the parties an actual, judiciable controversy within the meaning of the Declaratory Judgment Act, 28 U.S.C. §§ 2201 – 2202.

16.     Venue lies in this judicial district by virtue of 28 U.S.C. § 1391(e) as the National Park Service is an agency of the United States and is headquartered in this district.

## PARTIES

17.     Plaintiff SAG is a duly registered 501(c)(3) non-profit organization in the Territory of Puerto Rico dedicated to the welfare and care of the cats of Old San Juan.   Exhibit 1, Salicrup Decl. at 2 (¶¶ 3-4).  SAG was created in 2004 to humanely manage the community cat population around historic Old San Juan, particularly around the Paseo.  *Id.*  SAG has organizational standing because SAG's entire purpose is to provide for the health and well-being of San Juan's community cat population, and to manage the TNR program at the Paseo.  In fact, SAG was specifically incorporated as a non-profit due to NPS' requirement that the group that would manage and administer the TNR program be an incorporated organization.  *Id.*  Ending the TNR program at the Paseo would thus effectively end SAG's primary organizational purpose for existing in San Juan, Puerto Rico.  *Id.*

18.     SAG also has associational standing.  SAG's members are comprised of volunteers who consistently dedicate at least eight hours a month of on-the-ground labor, time, and other efforts to help achieve the organization's mission and purpose.  Exhibit 1 at 2 (¶ 5).  SAG's members elect SAG's board of directors and have a direct investment in SAG's mission and purpose to promote the TNR program at the Paseo.  *Id.*

19.     Defendant United States National Park Service is an agency within the Department of the Interior and was created by Congress to preserve, unimpaired, the natural and cultural resources and values of the National Park System for the enjoyment, education, and inspiration of this and future generations. NPS manages the San Juan National Historic Site and the resources and species found within it, including the community cats.

20.     Defendant Darrell Echols, Acting Regional Director of the South Atlantic-Gulf region of the National Park Service, is responsible for the strategic planning and direction, policy oversight, and assistance in public involvement, media relations, and programs for parks within the region, including the San Juan National Historic Site. On November 21, 2023, Mr. Echols predecessor Mark Foust signed the National Park Service's Finding of No Significant Impact Free-Ranging Cat Management Plan ("2023 FONSI").  He is sued in his official capacity.

21.     Defendant Jessica Bowron, Comptroller and Acting Director of the National Park Service, heads the National Park Service, which manages all national parks, most national monuments, and other natural, historical, and recreational properties, including the San Juan National Historic Site. She is sued in her official capacity.

22.     Defendant Doug Burgum, United States Secretary of the Interior, heads the United States Department of the Interior, which is charged with stewarding public lands, increasing environmental protections, and pursuing environmental justice. He is sued in his official capacity.

23.     Defendant Myrna Palfrey, Superintendent of the San Juan National Historic Site, manages all Park operations and programs, including NPS' 2023 Plan. On November 8, 2023, she signed the 2023 FONSI. She is sued in her official capacity.

## STATUTORY FRAMEWORK

### A.  National Environmental Protection Act.

24.     Congress enacted NEPA in 1969, directing all federal agencies to assess the environmental impacts of proposed actions that significantly affect the quality of the human environment.

25.     NEPA imposes substantial procedural requirements to "ensure[] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

26.     NEPA has two main aims: requiring agencies to (1) "consider every significant aspect of the environmental impact of a proposed action" and (2) "inform the public that it has indeed considered environmental concerns in its decision-making process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983); *Robertson*, 490 U.S. at 349.

27.     "To ensure a well-considered decision, NEPA requires that when an agency proposes a 'major Federal action[ ] significantly affecting the quality of the human environment,' the agency must prepare and circulate for public review and comment an environmental impact statement [("EIS")] that examines the environmental impact of the proposed action and compares the action to other alternatives.'" *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

28.     When developing an EIS, NEPA requires an agency to: (i) consider reasonable alternatives to the proposed action; and (ii) take a "hard look" at the environmental consequences of the decision.  *See* 42 U.S.C. § 4332(2)(C)(i)–(iii).

29.     However, not all agency actions require an EIS.  *Theodore Roosevelt*, 616 F.3d at 503.  "If it is unclear whether an action will 'significantly affect[ ] the quality of the human environment,' 42 U.S.C. § 4332(2)(C), agencies may [first] prepare an environmental assessment [("EA"),]" *id.*; which is "a more limited document," *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).

30.     Even if the agency determines that it needs only to perform an EA, it must still briefly discuss the need for the proposed action, the alternatives, and the environmental impacts of the proposed action, alternatives, and sufficient evidence for determining whether to prepare an EIS. 40 C.F.R. § 1501.5(c) (2020).  If the agency determines that a full EIS is not required, it must issue a finding of no significant impact, "the proposed action will not have significant effects." *Id.* at § 1501.6(a) (2020).

31.     Courts will overturn an agency's decision to issue a FONSI and not prepare an EIS "if the decision was arbitrary, capricious, or an abuse of discretion." *TOMAC, Taxpayers of Michigan Against Casinos v. Norton*, 433 F.3d 852, 861 (2006) (quoting *Sierra Club v. Perterson*, 717 F.2d 1409, 1413 (D.C. Cir. 1983).

32.     When examining a FONSI, a Court's job is to determine whether the agency: (1) has "'accurately identified the relevant environmental concern,'" (2) has taken a "'hard look'" at the problem in preparing its EA, (3) is able to make a convincing case for its finding of no significant impact, and (4) has shown that even if there is an impact of true significance, an EIS is

unnecessary because "'changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Town of Cave Creek v. FAA,* 325 F.3d 320, 327 (D.C. Cir.2003)

33.     NEPA's purpose is to ensure that "the agency will not act on incomplete information, only to regret its decision after it is too late to correct." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 371 (1989); *Robertson*, 490 U.S. at 349 ("NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast.").

34.     An agency's purpose and need as to a proposed action—in other words, the objectives or goals that guide its evaluation—"provide the point of reference for a determination whether an alternative is reasonable in the first place." *City of Alexandria, Va. v. Slater,* 198 F.3d 862, 867 (D.C. Cir.1999).  Thus, the court must "first consider whether the agency has reasonably identified and defined its objectives. The agency's choice of alternatives are, then, evaluated in light of these stated objectives." *Id.* at 867.

35.     Courts review both an agency's definition of its objectives and its selection of alternatives under the "rule of reason." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190 195–96 (D.C. Cir. 1991).  However, Courts will reject an "unreasonably narrow" definition of objectives that compels the selection of a particular alternative. *Id.* at 196.

36.     Requiring a "hard look" before acting ensures "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and general statements about possible effects and some risks do not constitute a "hard look" absent a justification for why more definitive information could not be provided.  *Robertson*, 490 U.S. at 349.

37.    Courts have also found that where the potential effects of a proposed agency action are highly controversial in that a "substantial dispute exists as to the size, nature, or effect of the major federal action" preparation of an EIS will be required. *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'nrs*, 255 F.Supp.3d 101, 127-128 (D.D.C. 2017).

38.    NEPA also requires federal agencies to consider the historic and cultural implications of a project that are raised during the decision-making process.   42 U.S.C. § 4331(b)(4); *see, e.g.*, *Center for Biological Diversity v. U.S. BLM,* 746 F.Supp.2d 1055, 1096 (N.D. Cal 2009) (Finding that in preparing an EIS "the onus is on the BLM to inform the public of the impacts of the Plan on cultural resources," and that to "for those areas in which [t]he effect of BLM routes of travel on public land cultural resources has not been fully determined . . . the FEIS is inadequate because it does not inform the public of the scope and extent of the impacts of the" proposed action); *National Parks Conservation Association v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019) (Congress has declared that preserv[ing] important historic, cultural, and natural aspects of our national heritage constitutes an important goal of . . . 42 U.S.C. § 4331(b)(4)" (quotations omitted)); *Oglala Sioux Tribe v. U.S. Nuclear Regulatory Commission*, 896 F.3d 520, 529 (D.C. Cir. 2018) (Noting that "NEPA's procedural mandate was intended to vindicate" the public interest in protecting "vulnerable but as-yet-unidentified historical, cultural, or religious sites.").

**B.  The Council on Environmental Quality Regulations.**

39.    Recently, multiple courts, including in this district, have called into question the validity and binding effects of the Council on Environmental Quality's ("CEQ") NEPA

Regulations.  *See Marin Audubon Society v. F.A.A.* 121 F.4th 902 (D.C. Cir. 2024); and *Iowa v. Council on Environmental Quality*, 2025 WL 598928 (D.N.D. Feb. 3, 2025); ECF No. 43.[4]

40.     Regardless, NPS admitted that it applied the 2020 and 2022 CEQ Regulations to its decision not to prepare an EIS here.  *See* NPS_3617[5]; ECF No. 27-1 at 14 (referencing the 2020 (85 Fed. Reg. 43,304 (July 16, 2020)) and 2022 (87 Fed. Reg. 23,453 (Apr. 20, 2022)) CEQ Regulations (40 C.F.R. §§ 1500-1508)).

41.     The 2020 and 2022 CEQ Regulations make clear that agencies must consider the cultural and social impacts of proposed agency actions.

42.     Specifically, the 2020 and 2022 CEQ Regulations hold that an EA must contain "sufficient evidence and analysis for determining whether to prepare an" EIS", 40 C.F.R. § 1501.5(c)(1), discuss the purpose and need for the proposed action, the alternatives as required by section 102(2)(E) of NEPA, the environmental impacts of the proposed action and alternative, and include a listing of agencies and persons consulted, *id.* § 1501.5(c)(2).

43.     The 2020 and 2022 CEQ Regulations also require agencies, when determining whether to prepare an EIS, to consider "whether the effects of the proposed action are significant" and "analyze the potentially affected environment and degree of the effects of the action."  40 C.F.R. § 1501.3(b).  In considering the degree of effects, agencies are required to consider "(i) both short- and long-term effects; (ii) beneficial and adverse effects; (iii) effects on public health and safety; and (iv) *effects that would violated Federal, State, Tribal, or local law protecting the environment*." *Id.* at (b)(2) (emphasis added).

---

[4] ECF No. references herein refer to docket entries in the related *Alley Cat Allies* Case.
[5] Similarly, NPS_ administrative record references herein refer to the current administrative record in the *Alley Cat Allies* Case.

44.     "Effects or impacts" mean "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and include" "[d]irect effects," "[i]ndirect effects," and "[c]umulative effects."  40 C.F.R. § 1508.1(g) (2022).  Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), *aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative*."  *Id.* at (g)(1) (emphasis added).

45.     Similarly, the CEQ Regulations require agencies to consider the environmental consequences of an action which include "[p]ossible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and Local land use plans, policies, and controls for the area concerned" and "[u]rban quality, historic and cultural resources, and the design of the build environment."  40 C.F.R. § 1502.16(a)(5), (8).  And while "[e]conomic or social effects by themselves do not require preparation of an [EIS]," when "the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment."  *Id.* at (b).

46.     Finally, the 2020 and 2022 CEQ Regulations modified the prior requirement for agencies to consider the "controversy" of a proposed action, stating that "courts have interpreted controversy to mean scientific controversy, which the final rule addresses within the definition of effects, as the strength of the science informs whether an effect is reasonably foreseeable."  85 Fed. Reg. at 43,322 (2020).   As such, the 2020 and 2022 CEQ Regulations require agencies to consider effects "that are reasonably foreseeable" including "*aesthetic, historic, cultural, economic, social, or health* [effects]*, whether direct, indirect, or cumulative*."  40 C.F.R. § 1508.1 at (g); (g)(1) (emphasis added).

**C. Administrative Procedure Act.**

47.    The APA provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702; *See also Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990).

48.    Only "final agency actions" are reviewable. 5 U.S.C. § 704. A final agency action is one that marks the consummation of the agency's decision-making process and one by which rights or obligations have been determined or from which legal consequences flow.

49.    Under section 706 of the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  In addition, a court must hold unlawful agency actions "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* at § 706(2)(C).

50.    In general, an agency decision is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

51.    When an agency changes its position on a prior policy, it must display an awareness that it is changing its position and must "show that there are good reasons for the new policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).  When an agency's new policy "rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account" it must provide

"a more detailed justification than what would suffice for a new policy created on a blank slate." *Id.* Similarly, it follows that an " [u]nexplained inconsistency" in agency policy is "a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *National Cable & Telecommunications Assn. v. Brand X Internet Services,* 545 U.S. 967, 981 (2005). To that end, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox Television Stations,* 556 U.S. at 516.

52.     As to whether an agency's actions are in excess of statutory jurisdiction, authority, or short of statutory right, "[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988); *see also Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C.Cir.2002) ("In the absence of statutory authorization for its act, an agency's action is plainly contrary to law and cannot stand.") (internal quotation marks and citations omitted). "To determine whether the agency's action is contrary to law, [courts] look first to determine whether Congress has delegated to the agency the legal authority to take the action that is under dispute." *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C.Cir.2001); see also id. at 1082 ("Agency authority may not be lightly presumed."). Further, "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Loper Bright Enterprises v. Raimondo,* 603 U.S. 369, 412 (2024).

53.     The APA provides a cause of action to challenge any final agency action where there is no other adequate remedy in court. 5 U.S.C. § 704. NEPA contains no specific judicial review provisions, so federal agency actions governed by these laws, including the 2023 Plan at issue here, are subject to judicial review under the APA. *Gov't of the Province of Manitoba*, 691 F. Supp. 2d at 40 n. 1.

**D.  The National Park Service's Authority Over Non-Park Lands.**

54.    NPS has adopted a host of regulations governing activities within national park units.  These NPS regulations apply, *inter alia*, within "[t]he boundaries of federally owned lands and waters administered by the National Park Service" and within "[w]aters subject to the jurisdiction of the United States located within the boundaries of the National Park System, including navigable waters."  36 C.F.R. §§ 1.2(a)(1), (3).

55.    NPS regulations generally do not apply to "non-federally owned lands and waters ... located within National Park System boundaries"  (*Id.* § 1.2(b)) unless they are navigable waters (*Id.* § 1.2(a)(3)) or for lands over which the United States holds less than a fee interest, and then only "to the extent necessary to fulfill the purpose of the National Park Service administered interest *and compatible with the nonfederal interest*" (*Id.* § 1.2(a)(5)).  Under the regulations, and as relevant here, "boundary" "means the limits of lands or waters administered by the National Park Service as specified by Congress." *Id.* § 1.4(a).  This means that NPS regulations do not apply to both (1) lands outside of a national park (or national historic site boundary); and (2) any non-federally owned lands within a national park (or national historic site boundary) except to the extent compatible with the nonfederal interest.

56.    Separately, NPS has restricted authority over National Recreation Trails.  National Recreation Trails may be designated by the Secretary of the Interior or Secretary of Agriculture. 16 U.S.C. § 1243.  However, when a trail is in or reasonably accessible to urban areas, "consent of the States, their political subdivisions, or other appropriate administering agencies" is required, and when trails are in areas owned or administered by States or privately owned lands, written consent is similarly required.  *Id.* at (b)(i)-(iii).  National *Recreation* Trails are distinguished from

National *Scenic* and National *Historic* Trails, the latter of which require Congressional enactments to be established and are subject to stricter oversight.  *See* 16 U.S.C. § 1244.

57.     According to the NPS, for National Recreation Trails, "there is no designated Federal oversight responsibility, investment, management, or other involvement beyond the designation recognition."  *See* National Recreation Trails – FAQ, What is the difference between NRTs and National Scenic and Historic Trails" (available at https://www.nps.gov/subjects/nationaltrailssystem/national-recreation-trails-faqs.htm (Last visited June 13, 2025).

58.     According to NPS Director's Order #45, National Recreation Trails "may also be administered by the Service, though not as units of the national park system. *In all cases, the Service will cooperate with other land managers, nonprofit organizations, and user groups to facilitate appropriate trail use in accordance with the laws and policies applicable to such trails*, and to the extent that trail management and use would not cause unacceptable impacts." Director's Order #45 at Section 3.1 – Management Policies (available at https://www.nps.gov/subjects/nationaltrailssystem/management.htm (Last visited June 13, 2025).

59.     Further, according to NPS Director's Order #45, parts 1 through 5 of Title 36 of the *Code of Federal Regulations* apply to the national trail system, except that those regulations only apply to trails under "State or local ownership, or privately owned, and administered by the NPS for trail purposes pursuant to an agreement with the landowner, to the extent that such regulations are consistent with the agreement. (The term "agreement" is used here as the term "cooperative agreement" is used in the National Trails System Act, although the agreements will be "general agreements" or "memoranda of understanding" within the meaning of Director's Order #20: Agreements)."  *Id.* at Section 3.12 – Regulations.   This means that the Department of Interior's

Code of Federal Regulations only apply to National Recreation Trails to the extent an agreement has been entered into with a local authority, and only to the extent that such regulations are consistent with such agreement.

## FACTUAL ALLEGATIONS

**A.  The Formation of the San Juan National Historic Site and the Paseo.**

60.    Puerto Rico is a territory of the United States.  Puerto Rico was ruled by the Spanish until December 10, 1898, when the United States and Spain signed the Treaty of Paris of 1898. Puerto Rico then became a Commonwealth in union with the United States.  Puerto Rico experienced a steady progression in the exercise of self-governance in the early 1900s, starting with the first organic act for Puerto Rico in 1900, and a July 1, 1902 grant of all public lands and buildings not reserved by the United States to Puerto Rico.  *See* 48 U.S.C. § 746 ("All public lands and buildings, not including harbor areas and navigable streams and bodies of water and the submerged lands underlying the same, owned by the United States in the island of Puerto Rico and not reserved by the President of the United States prior to July 1, 1903, pursuant to authority vested in him by law, are granted to the government of Puerto Rico, to be held or disposed of for the use and benefit of the people of said island.").

61.    Pursuant to the July 1, 1902 grant of lands to Puerto Rico, the United States could reserve lands in Puerto Rico prior to July 1, 1903.  President Theodore Rosevelt made two such reservations on June 26, 1903 and June 30, 1903, which reserved certain lands in Puerto Rico, including in San Juan, Puerto Rico.    Proclamation 502 (June 26, 1903) (available at https://www.presidency.ucsb.edu/documents/proclamation-502-reservation-lands-puerto-rico-for-naval-purposes#:~:text=Proclamation%20502%E2%80%94Reservation%20of%20Lands,Purposes%20

18

%7C%20The%20American%20Presidency%20Project (Last visited June 13, 2025)) Proclamation

503 (June 30, 1903) (available at: https://www.presidency.ucsb.edu/documents/proclamation-503-reservation-lands-puerto-rico (Last visited June 13, 2025).

62.     In 1917, Congress passed the Jones Act, which granted authority to Puerto Rico over non-reserved lands and increased the scope of self-governance. Pub. L. 368 (March 2, 1917), H.R. 9533.

63.     Specifically, the government of Puerto Rico was granted control of all property which may have been acquired by the United States, including "all the harbor shores, docks, slips, reclaimed lands and all public lands and buildings not heretofore reserved by the United States for public purposes," and all "harbor areas and navigable streams and bodies of water and submerged lands underlying the same" not previously reserved by the United States.  *Id.* at Sec. 7, 8.

64.     Puerto Rico became a U.S. Commonwealth and Territory in 1952 *See* H.J. Res. 430 approving the constitution of the Commonwealth of Puerto Rico, as enacted July 3, 1952, is Public Law 447, 82d Congress (66 Stat. 327), which became effective on July 25, 1952.

65.     The Park was designated as a national historic site by the Secretary of the Interior through the establishment order for the San Juan National Historic Site.  *Fed. Reg.* Doc 49-1402 (Feb. 25, 1949) ("1949 Enactment").  In that designation, the Secretary designated "the fortresses of El Morro and San Cristobal, Casa Blanca, and El Canuelo on Cabras Island, including the areas shown on the diagram, marked 'Exhibit A.'"  *Id.*

66.     The Exhibit A showing the designated boundaries of the San Juan National Historic Site was not included in the 1949 Enactment in the *Federal Register*.  However, a copy of that referenced map was included in a February 28, 1951 internal memorandum in the National Park Service that sought to clarify the Park's boundaries, and showed that the boundary of the Park was

the external walls of the fortress, and did not extend to the land beyond the fortress walls. Exhibit 2 at p. 5. A copy is reproduced below:



67.    That same memorandum included an "Exhibit C" which was the culmination of the National Park Service's investigation of the Park's boundaries and was intended to "define the boundaries in the cooperative agreement between the Department of the Interior and the Department of the Army" (Exhibit 2 at p. 6), which also concluded that the boundaries of the Park ended at the fortress walls, and did not extend onto the land beyond the walls. Exhibit 3. A copy is reproduced below:



68.     These maps confirm that the boundaries of the Park as of 1951 and as of the Park's designation as a National Historic Site did not extend beyond the fortress walls, and did not include the lands or beach beyond the fortress walls.

69.     Similarly, the 1972 National Register of Historic Places nomination for the San Juan Historic Zone recognized the same fortress wall boundaries of the Park.  NPS_1, at NPS_5.

70.     On September 29, 1976, a cooperative agreement was entered into between the Department of the Interior and Puerto Rico (the "1976 CA").  NPS_38; NPS_112.

71.     The 1976 CA recognizes that portions of the Park are under the ownership/title of Puerto Rico.  *Id.*

72.     While the 1976 CA contains some maps of the Park that indicate its boundaries may extend past the existing fortress walls, there is no reference to any subsequent Congressional enactment or *Federal Register* publication that would have authorized such an extension.  As such, the 1949 Enactment in the *Federal Register* setting the boundaries of the Park still applies.

73.    Here, the Paseo is located outside the Park boundaries according to the 1949 *Federal Register* enactment.  As such, NPS regulations do not apply to the Paseo, and NPS lacks authority and jurisdiction to implement the 2023 Plan.  36 C.F.R. §§ 1.2(a)(1), (3), (b).

74.    Further, even for the portions of the Paseo that may overlap or be inside Park boundaries (if any), portions of the Park are also owned by Puerto Rico and thus excluded from NPS authority and jurisdiction except to the extent compatible with Puerto Rico law.

**B.  The Formation of the Paseo del Morro and its Designation as a National Recreation Trail.**

75.    The area that is the Paseo now originally served as a maintenance access route that was constructed in 1995 as a dirt path.  NPS_3131, 3135, 3141.  That dirt path was then paved in 1999, with funds from the Puerto Rico Tourism Company ("PRTC") through a cooperative agreement between the PRTC and NPS.  *Id.*

76.    The Paseo is entirely outside of the fortress walls, and thus, is also entirely outside of the Park boundaries as designated in the 1949 Enactment.  Use of the gate to the Paseo is governed by an agreement between NPS and the Puerto Rico Commonwealth government.  NPS_0526.

77.    The Paseo later became a National Recreation Trail in 2001. *Id.*

78.    The Paseo (and associated National Recreation Trail) was and is subject to existing memoranda of understanding ("MOUs") with the PRTC at the time of the 2023 Plan development.  That MOU is the January 23, 2023 MOU between the PRTC and NPS.  Exhibit 4 ("2023 MOU").

79.    The 2023 MOU recognizes that the Park was established pursuant to the February 14, 1949 enactment (Fed. Reg. Doc. No. 49-1402) and does not reference any subsequent enactments for the Park, confirming the Park is the size declared in the 1949 enactment.  *Id.* at 1.

80.     The 2023 MOU states that the agreement and rights of the parties "shall be governed by and construed in accordance with the applicable laws of Puerto Rico, excluding its conflicts of law provisions and of Federal law." *Id.* at 5.  Further, in a prior 2014 Memorandum of Understanding with the PRTC, the NPS "agree[d]: . . . [t]o contribute and coordinate with the Municipality of San Juan and non-profit organizations *for the humanely* [sic] *control of the feral cat population currently inhabiting the Paseo . . . .*".

81.     Upon information and belief, that 2023 MOU has been extended with the PRTC and remains applicable at the Paseo in a substantially similar form.

82.     The Paseo (and associated National Recreation Trail) is also subject to existing MOUs with SAG.  *See* NPS_251-NPS_258.  Those MOUs obligate NPS to, among other things, "allow unlimited access to members of [SAG] for activities related to feeding and trapping of cats, and for population surveys", for the maintenance of "feeding stations for the cats", for "inform[ing the PRTC] officials of the present agreement and the need to enforce these rules", and that NPS "will continue to support [SAG] with cages and/or other equipment to facilitate the [TNR] program."

83.     Circa 2012, NPS proposed an extension of the existing Paseo.  When NPS provided notice of a preparation of an EIS for the extension of the Paseo in 2012, it noted that segments of the extension would occur "within and outside of the NPS boundary" for the Park, and would require the involvement of multiple entities, including the Municipality of San Juan and the Commonwealth of Puerto Rico and neighborhoods along the trail corridor."  77 Fed. Reg. 68,416 (Nov. 15, 2012).  On information and belief, the extension of the Paseo has not been built and the EIS has not been completed.  *See* https://parkplanning.nps.gov/parkHome.cfm?parkID=403 (Last

visited June 13, 2025).   However, this 2012 notice evidences that NPS believed at the time that

portions of the Paseo were under, and subject to, local control.

84.    As such, the Paseo (and associated National Recreation Trail) is thus subject to

existing MOUs between NPS and both SAG and the PRTC, requiring NPS to abide by those

existing MOUs and coordinate with local authorities on the management of the Paseo as a National

Recreation Trail pursuant to Director's Order #45.

**C. The Cats' Safe Existence in the Community Prior to NPS's 2023 Plan.**

85.    Puerto Rico is home to a very large and cherished community cat population.

Community cats occupy a significant place in the culture of Puerto Rico. In fact, the cats are so

popular that their images are regularly featured on souvenirs.

86.    Community cats have lived in the area that is now the Paseo for decades and

throughout Old San Juan for centuries, predating the existence of the Paseo.

87.    After the Paseo was created, community cats already in the area quickly made their

home along the new path—an inevitable result given that cats were already living on those grounds

and in the area and given the number of community cats in Puerto Rico.

88.    In December 2003, the United States Department of Agriculture, the Animal and

Plant Health Inspection Service ("APHIS"), and Wildlife Services, in cooperation with NPS,

published an environmental assessment proposing various alternatives to manage the cat

population in the Commonwealth of Puerto Rico (the "2003 EA"). The agencies' stated reasons

for action were the following:

> 1) the sheer abundance of cats in some areas, 2) the unpleasant site of cat corpses,
> or of individuals in poor condition, 3) the profusion of kittens, often in poor
> health—a female may produce 2 or 3 litters of up to 10 kittens per year, 4) annoying
> caterwauling, 5) nocturnal fighting, 6) trampling on, digging up, or defecating on
> gardens, vegetable patches, etc., 8) [sic] disturbing rubbish bins and scattering litter,
> 9) they will often enter homes and other buildings uninvited, 10) they will

24

occasionally kill or scare birds, fish or other animals, 11) risk of attacks on babies in prams (baby carriage), children, or other pets, 12) the possible health risks from the transmission of various diseases from cats to pets or humans (particularly children); including ringworm, cat scratch fever and toxoplasmosis,[6] 13) they may be breeding grounds for fleas, and 14) the foul smell and maggots/flies resulting from the excess food left around for feral cats by over-enthusiastic cat lovers.

NPS_180.

89.    In 2004, NPS and APHIS began discussion regarding a "free-ranging cat management program" at the San Juan National Historic Site. Due to public concerns and protests, NPS did not move forward with efforts to remove the cats under the 2003 EA.   SAG, the Puerto Rican Feral Cats Association, the Society for the Prevention of Cruelty against Animals of Puerto Rico, and Animal Control Solutions developed a plan to work together to implement the TNR program for the management of "free-ranging" cats at the Paseo.

90.    In 2005, NPS entered a Memorandum of Understanding with SAG authorizing the TNR program.  NPS_251 (the "2005 MOU"). The 2005 MOU granted SAG unlimited access to the Paseo to establish a TNR program, supported by limited funding from NPS to provide traps and materials to aid the initial trapping effort and five feeding stations to feed the cats returned to the Park after they were neutered, eartipped, and evaluated by a veterinarian pursuant to the TNR program.

91.    NPS never provided the traps and materials to aid SAG in administering the TNR program as contemplated in the 2005 MOU.  Exhibit 1 at 3-4 (¶¶ 10-15); *see also* 2023 FONSI, NPS_3632 ("[t]o date, the National Park Service has only spent money on this NEPA process, and no other money has been set aside specifically for cat management at the park").

---

[6] NPS has yet to demonstrate any evidence of disease transmission between community cats in the Paseo and Paseo visitors despite alleging this was a concern since 2003. Importantly, the 2003 EA *does not* classify the community cats as an invasive species.

92.    In 2008, premised in large part on the success of the TNR program in managing the community cat population in the Paseo, NPS and SAG entered into another Memorandum of Understanding, extending SAG's unlimited access to the Park and increasing the number of feeding stations to eight.  NPS_251 ("2008 MOU").  NPS again pledged continued material support to SAG's TNR efforts, which was critical given that SAG is powered entirely by the efforts of motivated volunteers.  Again, NPS never provided the material support to SAG, including traps and gloves, contemplated by the 2008 MOU.  Exhibit 1 at 3-4 (¶¶ 10-15).

93.    Since the 2005 MOU, almost two decades ago, Plaintiff SAG has successfully managed the cat population through the TNR program, addressing many of the issues cited in the 2003 EA by reducing procreation and mating behavior among the cats and preserving the cats' historical, social, and cultural role within the Park and in the broader Puerto Rican community.

94.    Under NPS's illogical and inhumane 2023 Plan, these cats who live on Paseo are now susceptible to being removed from their home and killed. The same cruel fate will undoubtedly meet hundreds more cats when the numerous cats living in and around Old San Juan move in to take advantage of the resources that sustained the initial Paseo cats, and that new cat population reproduces back to capacity, a scientific phenomenon known as the Vacuum Effect.

**D.  NPS's 2023 Plan to Eradicate the Cat Population in the Paseo.**

95.    In the fall of 2022, NPS began the public scoping comment period to determine a new community cat management plan for the Paseo. The comment period was open from October 20 to December 12, 2022, and public meetings occurred on November 2 and 3, 2022. In total, 2,511 comments were received. The overwhelming majority of the comments expressed substantially the same message: *please do not remove or kill the cats, the Park is their home, and the community and visitors love them*. NPS_2576-3094, National Park Service, United States

26

Department of the Interior, "San Juan National Historic Site Free-Ranging Cat Management Plan
Public Scoping Correspondences" (2022).

96.    NPS thereafter published an environmental assessment on August 4, 2023.
NPS_3126 ("2023 EA").  NPS announced the alternatives purported to be under consideration:

> The draft Free-Ranging Cat Management Plan/Environmental Assessment
> evaluates three alternatives for management of the free-ranging cats in the park.
> Under the no-action alternative (alternative 1), no changes would be made to the
> current management of free-ranging cats. Under the original proposed action
> (alternative 2), the NPS would enter into an agreement with an organization(s) or
> agency(s) to remove the cats from the park. Following analysis of the public
> scoping comments, the NPS added an alternative that revised the original proposed
> action. The revised proposed action (alternative 3 / NPS preferred alternative)
> would allow an animal welfare organization six months to trap and remove cats
> from the park with the use of the current feeding stations, after which time the
> feeding stations would be permanently removed from the park.[7]

97.    In November 2023, NPS released the 2023 FONSI which announced the selected
action NPS had chosen to manage the community cat population in the Paseo. Just like the
comments received during the 2022 public scoping period, the comments on the EA included in
the FONSI were dominated by protests against the 2023 Plan, expressions of love for the
community cats, and pleas that NPS consider alternatives other than cat removal and killing.
Indeed, one needs look no further than Concern Statement 1 in the FONSI:

> The process for this plan has been disingenuous for a variety of reasons. During the
> scoping period, the no-action alternative was presented as a viable option, but the
> EA stated that the National Park Service would not be able to select the no-action
> alternative for implementation. Additionally, one commenter noted that [NPS]
> promised that euthanasia would not be a part of the plan, but both action alternatives
> lean heavily on euthanasia for management of the cat colony at the park. Some
> members of the planning team do not speak Spanish or live in Puerto Rico, limiting
> their understanding of the culture. It appears that [NPS] has already decided how
> the cats at the park will be managed and that the feelings or desires of the local
> residents or tourists who support the cats in all of Old San Juan were not taken into

---

[7] https://www.nps.gov/saju/learn/news/san-juan-national-historic-site-announces-public-meeting-to-present-draft-free-ranging-cat-management-plan-and-environmental-assessment.htm    (Last visited June 13, 2025).

consideration. The meeting for the review of the EA was held during hurricane season at a hotel, rather than at the park, and without notice to the Spanish press. The way this process has been handled reinforces locals' mistrust of the federal government.

NPS_3626.

98.    Unmoved, NPS predictably selected alternative 3, *i.e.*, "a phased approach to management of [community] cats, which will include continued trapping and removal efforts by an animal welfare organization, removal of all feeding stations in the park, monitoring, and additional removal efforts if deemed necessary"; and NPS will kill or cause to be killed any removed cats that are deemed unsuitable for adoption or that cannot be placed in animal shelters due to limited space. *Id*. at 3618, 3625.

99.    NPS clarified in the 2023 FONSI that if a suitable animal welfare organization cannot be identified, is not able to remove the cats quickly enough in NPS's opinion, or if there is a "sustained presence of cats inside the park," then "a removal agency other than the animal welfare organization would be employed to remove the cats." NPS_3146.

100.    Alternative 3 was selected instead of: (i) a no-action alternative, which would have upheld the status quo of cats living peacefully in the Park while allowing for continued and expanded efforts to trap, neuter, eartip, vaccinate, and return the cats back into the Park, while maintaining TNR-critical feeding stations; and (ii) alternative 2, which is substantially the same plan as alternative 3. The FONSI states that NPS could not select the no-action alternative because "it violates NPS regulations and policies related to invasive species, abandonment, and feeding wildlife within the park." NPS_3612. Thus, in NPS's own words, the no-action alternative was defined out of consideration by NPS's chosen purpose and need statement. Notably, this alternative that NPS now claims it could not consider because it violates regulations is the practice that has been in place for eighteen years, since just after the Paseo came into existence.

101.    Rather than consider in earnest alternatives to removing and killing the community cats, NPS pretextually narrowed the "alternatives" to three, one of which it dismissed out of hand as inconsistent with existing authorities, and the other two "alternatives" only varied in a single detail: who would remove the cats. By proceeding from a misleading and unreasonably narrow starting point, NPS violated NEPA by failing to *actually* consider any alternative other than removal, including failing to consider whether it could bolster the existing TNR program by providing actual NPS support and resources, or in conjunction with broader programs addressing cat abandonment in the surrounding Old San Juan area.

**E. NPS' Purpose and Need Statement was Improperly Narrow and Failed to Consider Reasonable Alternatives.**

102.    NPS' alternatives were improperly narrowed by its purpose and need statement, which NPS used to eliminate the no-action alternative from consideration.  In the 2023 EA, for the first time, and in a reversal of its prior position, NPS claimed that the existing TNR program was inconsistent with "existing authorities," identifying 36 C.F.R. § 2.2; its own NPS *Management Policies* ("2006 Management Policies", NPS_5393); and Executive Order 13112, Invasive Species, as later amended by Executive Order 13751, Safeguarding the Nation from the Impacts of Invasive Species, all of which were in existence and known to NPS at the time of the 2008 MOU which expanded the TNR program established by the 2005 MOU.[8]

103.    36 C.F.R. § 2.2(a)(2) merely states that "[t]he feeding, touching, teasing, frightening or intentional disturbing of wildlife nesting, breeding or other activities" is prohibited. This is clearly targeted at prohibiting feeding of animals by park *visitors,* and not authorized park personnel or partner agencies.  Further, 36 C.F.R. § 2.2(a)(1) expressly *permits* "authorized"

---

[8] As set forth herein, because the Paseo is outside of the Park boundaries, NPS lacked authority to impose the regulatory provisions and management policies on the Paseo in the first instance.

trapping performed pursuant to a federal mandate, such as what was occurring under the existing TNR program.

104.    The 2006 Management Policies govern the management of NPS programs.  Section 4.4.4 of which (NPS_5449, *Management of Exotic Species*), details the policies under which NPS declared it would manage alleged invasive species.[9]  Importantly, the 2006 Management Policies in Section 4.4.4.2, *Removal of Exotic Species,* states that exotic plant and animal species:

> *that are not maintained to meet an identified park purpose* will be *managed–up to and including eradication*–if (1) control is prudent and feasible, and (2) the exotic species
>
> > interferes with natural process and the perpetuation of natural features, native species, or natural habitats, or
> >
> > disrupts the genetic integrity of native species, or
> >
> > disrupts the accurate presentation of a cultural landscape, or
> >
> > significantly hampers the management of park or adjacent lands, or
> >
> > poses a public health hazard as advised by the U.S. Public Health Service (which includes the Centers for Disease Control and the NPS public health program), or
> >
> > creates a hazard to public safety.
>
> High priority will be given to managing exotic species that have, or potentially could have *a substantial impact on park resources*, and that can reasonably be expected to be successfully controlled.  Lower priority will be given to exotic species that have *almost no impact on park resources or that probably cannot be successfully controlled.  Where an exotic species cannot be successfully eliminated, managers will seek to contain the exotic species* to prevent further spread or resource damage.
>
> The decision to initiate management should be based on a determination that the species is exotic. For species determined to be exotic and where management appears to be feasible and effective, superintendents should (1) evaluate the species'

---

[9] As set forth herein in paragraphs 128-137, *infra*, Plaintiff does not concede that the community cats of the Paseo are, or have been proven to be, an invasive species under existing definitions for invasive species due to their long-standing presence in Puerto Rico, San Juan, and the National Historic Site including the Paseo.

current or potential impact on park resources; (2) develop and implement exotic species management plans according to established planning procedures; (3) consult, as appropriate, with federal, tribal, local, and state agencies as well as other interested groups; and (4) invite public review and comment, where appropriate. Programs to manage exotic species will be designed to avoid causing significant damage to native species, natural ecological communities, natural ecological process, *cultural resources*, and human health and safety.

NPS_5450 (emphasis added).

105.    The 2006 Management Policies thus make clear that NPS has several options for managing exotic species.  Such species can be managed "*up to and including eradication*" but only if such control "is prudent and feasible" and the exotic species meets one of several predefined thresholds, such as creating a hazard to public safety.   NPS 5450 (emphasis added).  Even where control is prudent and feasible, "eradication" is not mandated, and lesser methods of control, such as "prevent[ing] further spread or resource damage" are allowable.  *Id.*  Further, only high priority should be given to exotic species that have "*a substantial impact* on park resources," indicating that if NPS termed cats a "high priority" it had also determined that substantial impacts were anticipated by the cats, necessitating an EIS.  *Id.* (emphasis added).  Finally, when deciding to initiate management of an exotic species, NPS must consult with local and state agencies, and design any program to "manage exotic species" to "avoid causing damage to native species" and "cultural resources."  *Id.*

106.    Separately, Executive Order 13112 and Executive Order 13751 note that it is the policy of the United States to "to eradicate and control populations of invasive species that are established."  "Control" is defined as meaning "containing, suppressing, or reducing populations of invasive species."  Again, these authorities clearly contemplate methods that stop short of full eradication of an invasive or alien species (which the community cats are not).

107.    Despite the clear management options available in the cited authorities, NPS claimed in the 2023 EA that "[t]he National Park Service is unable to select the no-action alternative, as it violates NPS policies and regulations related to invasive species, wildlife, and feeding animals within the park." NPS_3142. But as set forth above, this is facially untrue, as NPS' existing authorities *explicitly allow* management options that include TNR.

108.    Further, NPS refused to consider alternatives that had some modified version of the existing TNR program, such as a long-term TNR program whereby NPS would provide more substantial resources to administer the TNR program in conjunction with efforts to prevent abandonment at the Paseo. NPS_3147.

109.    By artificially eliminating *any* TNR program from consideration through its narrow (and incorrect) purpose and need statement, NPS did not consider viable alternatives beyond removal and killing.

110.    NPS attempts to reconcile this contradiction in the 2023 EA by stating that "the feeding stations have been allowed at the park for management of the "free-ranging cats" through the TNR program with the intent to reduce and ultimately eliminate both the cats and feeding stations from the park." NPS_3142. Eliminating all cats from the Park was, is, and will continue to be an unrealistic, unnecessary, cruel, and unachievable goal. By narrowly construing the purpose of the project as such, NPS violated NEPA by defining away the ability to consider any alternatives other than the removal of the cats.

111.    Despite a brief description of suggested alternatives, NPS's cursory treatment of those alternatives is telling. The FONSI summarily rejects the "no-action" (continued TNR program) alternative based on its conclusion that TNR is incompatible with existing authorities and that the TNR Program, by itself, would not eliminate the cat population in the Paseo, stating

that under the TNR program by itself, "the cats would persist in the park and may even continue to increase in abundance." NPS_3147. This conclusion does not meaningfully engage with the viability of TNR if other measures are also utilized, such as increased security and education and messaging to reduce cat abandonment—the exact measures NPS recognizes it must couple with its removal 2023 Plan. These measures, in conjunction with the existing TNR program, should have been considered as an alternative but were not; that failure alone is fatal to NPS's 2023 Plan under NEPA.

### F. NPS Failed to Respond to Public Comment and Address Reasonably Foreseeable Effects of the 2023 Plan.

112.    In addition to narrowly defining its purpose and need statement and artificially eliminating viable alternatives, NPS also failed to meaningfully respond to public comments identifying reasonably foreseeable impacts of its 2023 Plan to end the TNR program.

113.    First, NPS failed to address comments pointing to a significant volume of scientific evidence that the removal of community cats from the Paseo was likely to simply draw in the abundant number of community cats from the surrounding Old San Juan, resulting in a never-ending cycle of cat killing.

114.    This scientific phenomenon is known as the Vacuum Effect, something NPS specifically acknowledged in the 2023 EA. *See* NPS_3147. Several commenters raised this issue to NPS in comments on the 2023 EA, pointing out that NPS had not adequately studied the issue or anticipated the Vacuum Effect that would occur at the Paseo under its 2023 Plan. *See* NPS_6159 (Correspondence ID: 174); NPS_6192 (Correspondence ID: 283); NPS_6205-6206 (Correspondence ID: 327); *See* NPS_6231-6232 (Correspondence ID: 407); *See* NPS_6250 (Correspondence ID: 448); NPS_6250-6251 (Correspondence ID: 449); *See* NPS_ 6252-6253(Correspondence ID: 451) *See* NPS_6296-6297 (Correspondence ID: 526);. This included

comments from SAG itself. *See* NPS_6271-6272 (Correspondence ID: 487); *See* NPS_6313-6314 (Correspondence ID: 550).

115.    NPS' rather than taking the invitation to conduct meaningful study of the issue, dismissed these comments without material analysis, noting that there is "scientific literature both supporting and refuting the [V]acuum [E]ffect." *See* NPS_3147; NPS_3632. NPS simultaneously admitted that "cats from the city [of Old San Juan] would likely enter the park after existing cats are removed." NPS_3164. Confusingly, NPS also claimed that the "removal of cats at the park would not noticeably affect the population of cats in Old San Juan." NPS_3140.

116.    Perhaps most telling, though, was NPS' claim that it would employ "a variety of management techniques in addition to removal efforts" to combat a potential Vacuum Effect, and that "[t]his integrated approach is intended to reduce the potential for a new colony forming at the park." NPS_3164. NPS also claims it will "reduce the potential for pet abandonment in the park" by continuing "to close the entrance to the Paseo at night" and having "security guards present when the Paseo is open (under an agreement with the Department of Tourism)[,]" and providing "additional security" by "installing a new lighting system along the Paseo." NPS_3618. NPS states it will also "increase educational efforts through additional messaging, addressing the reasons cats cannot be abandoned in the park, and noting that the park does not provide food for abandoned cats." *Id*.

117.    Yet it is exactly the concept of complementary "management techniques" that NPS rejected in response to commenters raising alternatives that would couple the TNR program with increased education on abandonment; increased funding for the TNR program (over the zero funding currently offered by NPS); and a collaborative effort with the local municipality,

universally (and incorrectly), *See* NPS_3632-3636, claiming that these suggestions "will continue to allow cats in the park" and thus "violates NPS regulations and policies," *See id*.

118.    As explained, it is unreasonable to expect cats to be completely eradicated from the Paseo given the size of the broader cat population in Puerto Rico and the inevitable results of the Vacuum Effect.  NPS, by building in these defaults, completely undermines the point and purposes of pledging to utilize an animal welfare organization in the first instance. New cats will enter the Park and additional removal efforts will continue to be necessary.

119.    Indeed, through its 2023 Plan, NPS is pledging that in pursuit of its arbitrary goal to eradicate cats (that NPS has not demonstrated are causing any harm) in the Paseo, it will perpetually remove and kill cats that find their way onto this 0.75-mile strip of land.

120.    Second, NPS also failed to investigate other potential reasons as to why the TNR program had been "less successful" than anticipated, both misinforming the public as to the efficacy of TNR and failing to consider ways to bolster the existing program to further the benefits it provides.

121.    NPS takes the position that the existing TNR program has been "unsuccessful" based on its highly-flawed estimate of community cat population size exclusively on the fact that under the current TNR program, the modest community cat population in the Paseo has allegedly increased from 120 cats to approximately 200 cats *over the course of eighteen years*—though SAG and other commenters disputed this estimate. NPS_3147.

122.    By focusing on the size of the community cat population within the Paseo as the exclusive metric for determining the success of the existing TNR program and insisting the only acceptable outcome is the complete eradication of the community cat population within the Paseo, NPS ignores both reality and the clear value the TNR program provides.  Specifically, TNR

reduces mating behavior, assists in stabilizing the cat population, and decreases the already extremely unlikely possibility of any disease transmission between cats and humans or other species within the Park[10] (and, in fact, NPS has found no such transmissions).   NPS_3648.   By these other measures, the TNR program has been, and continues to be, immensely successful, and only stands to enjoy further success if TNR funding and education efforts are increased. Were NPS to implement its 2023 Plan, cat abandonments are all but certain to persist; the benefits detailed above, including neutering to alter behavior and prevent reproduction, will cease; and cats far less likely to be sterilized will move into the newly vacated territory and quickly breed back to capacity. NPS is very likely implementing a 2023 Plan that will not only kill cats but also result in a larger and less stable cat population within the Park and, consequently, an endless cycle of removal and killing of cats under said plan.

123.    This feared outcome is not speculative—NPS itself acknowledges this reality. In dismissing alternative 1, NPS also noted that "[i]n a population that is not isolated, such as the one at the park, TNR is not effective. *New cats come into the colony from other populations and from being abandoned by owners*."  NPS_3147 (emphasis added).  Herein lies the irrationality inherent in NPS's reasoning, *i.e*., even if the existing cat population is trapped and removed (and likely "euthanized") as NPS proposes, new cats will continue to come into the Park "from other populations and from being abandoned by owners."

124.    NPS's own scientists observed that twenty-six cats within the Paseo "are pregnant or were recently pregnant."  *Id*.  Given that the TNR program emphasizes neutering to decrease both reproduction and mating behavior among the cats, the existence of so many pregnant cats

---

[10] *See* https://www.alleycat.org/resources/why-trap-neuter-return-feral-cats-the-case-for-tnr/ (Last visited June 13, 2025).

strongly suggests that those cats recently came in from other populations and/or were recently abandoned because, as NPS acknowledges, "[c]ompanion animals that are abandoned are often not spayed or neutered, and those animals contribute to the cycle of reproduction and unwanted pets."  Thus, if NPS believes TNR must end because it cannot eradicate cats in the Paseo, then removal, by the same logic, is not viable because it will also fail to eradicate cats in the Paseo; worse yet, it will result in a larger population of unneutered and unvaccinated cats who are able to reproduce.

125.    Regardless, NPS failed to address other causes for the increase in population, such as the COVID-19 pandemic, hurricanes, and a lack of enforcement of cat abandonment issues by the local community—issues raised by commenters.  *See e.g.* NPS_6275-6278 (Correspondence ID: 492) (Noting that occurrences such as the COVID-19 pandemic and hurricanes affected San Juan and impaired the ability of the local government to address the issue of community cats); NPS_6240-6243 (Correspondence ID: 433) (noting a lack of local resources and cat abandonment as key issues hampering the TNR program, and noting that NPS employees did not enforce cat abandonment but instead directed them to SAG's doorstep).   Further, NPS even recognized that the COVID-19 pandemic halted mass sterilization clinics in Puerto Rico, but never addressed whether that may have accounted for its "estimate" of community cats in the Paseo or the success of the TNR program.  NPS_3150.

126.    Third, NPS initially acknowledged that shelters and animal welfare facilities have limited capacity and that few of the cats that will be removed may be eligible for adoption.  *See* NPS_1240, National Park Service, United States Department of the Interior, "Free-Ranging Cat Management Plan Public Scoping Newsletter," p. 5 (2022). Therefore most, if not all, of the cats who are "removed" pursuant to alternative 3 will likely be killed. NPS claims it created alternative

37

3 to address concerns raised by residents and tourists that the cats would be killed, a reality NPS was forced to recognize in the 2023 FONSI. *See* NPS_3630-3631. Thus, reality of the limited shelter space and opportunity for these cats to be housed and/or adopted means the actual consequence of alternative 3 will be the killing of many of these cats—the exact consequence NPS purports alternative 3 was designed to avoid. This means that when NPS represented to the public that the no-action alternative was a viable option or that it would create another alternative to avoid "euthanasia," it was knowingly misleading the public, directly contradicting NEPA's aims of accountability and informed public participation.

127.    Moreover, alternative 3 is substantially identical to alternative 2 (NPS's initial proposed action), with the nominal change that the initial removal efforts will be undertaken by an animal welfare organization instead of a removal agency (though, if the animal welfare organization is unsuccessful or one cannot be identified, a removal agency will still be utilized). *See* NPS_3618, 3620, 2023 FONSI. Thus, despite representing that the EA objectively assessed three alternatives, as required by NEPA, NPS only *truly* considered and presented one option: removal of the cats.

128.    <u>Fourth</u>, attempting to explain why it is pursuing a complete eradication of community cats within the Paseo, NPS asserts, without any evidence or support, that forcibly removing the cats from the Paseo will protect native species and help prevent the introduction of diseases into the human and aquatic environment. *Id*. at NPS_3641, NPS_3647-3648. NPS reached this conclusion despite its acknowledgment that "*there are no site-specific studies documenting cats preying on wildlife in the park or contributing to T. gondii [or any other disease] in the environment*." *Id*. at NPS_3648 (emphasis added). Yet commenters on the 2023 EA pointed out that NPS' evidence was unsubstantiated. NPS_6280-6281 (Correspondence ID 495);

NPS_6291-6293 (Correspondence ID: 516).   And as NPS admits, it "has never completed a natural resources assessment" of the Park.  NPS_3160.  This does not meet NPS' burden to examine the environmental effects of its proposed action.

129.    NPS's lack of evidence that the cats are causing any identifiable harm is no small detail.  Indeed, NPS states the goal of its 2023 Plan is to "bring the park into compliance with existing authorities for *invasive species*, reduce human health and safety concerns, align the visitor experience with the purpose of the park, protect park resources, alleviate nuisance issues, and reduce impacts on native wildlife species associated with free-ranging cats." NPS_3127 (emphasis added).

130.    <u>Fifth</u>, NPS failed to address the cultural significance of the community cats at the Paseo and in Old San Juan.   Hundreds of comments at both the scoping phase and on the 2023 EA expressed the longstanding cultural significance of the community cats at the Paseo.  Yet in the 2023 EA, when discussing cultural resources, NPS does not identify the community cats as a cultural resource.  NPS_3138-3139.

131.    Similarly, in the 2023 FONSI, the best NPS could muster was that while it acknowledged that "the cats are held in sentimental regard for many residents and visitors," NPS was required to "bring the park into compliance with existing authorities on invasive species, abandonment, and feeding wildlife."  NPS_3638; *see also* NPS_3644.  Yet as discussed earlier, NPS' existing authorities contemplate management and control of a lesser degree than complete eradication, removal, and killing even of invasive species (which community cats are not).

132.    Moreover, NPS' "existing authorities" require a careful consideration of the cultural value of any managed exotic species, including that programs must be managed and "designed to avoid causing significant damage to . . . cultural resources."  NPS_5450.

133.    Similarly, guidance from the Department of the Interior's ("DOI") own Invasive Species Advisory Committee explains that determining whether a species is invasive requires "comparing negative effects caused by a non-native organism to its potential societal benefits." Invasive Species Advisory Committee, Invasive Species Definition Clarification and Guidance, p. 2 (April 27, 2006).[11]

134.    And, the CEQ Regulations on which NPS relied to promulgate the 2023 Plan require NPS to consider effects "that are reasonably foreseeable" including "*aesthetic, historic, cultural, economic, social, or health* [effects]*, whether direct, indirect, or cumulative*." 40 C.F.R. § 1508.1.

135.    Just like its arbitrary narrowing and elimination of reasonable alternatives, NPS conducted no such comparison of the cultural and societal benefits of the community cats because it made a pre-decisional conclusion that the community cats could have *zero* value since they were inconsistent with its existing authorities.  That conclusion was wrong and rendered NPS' 2023 FONSI arbitrary and capricious.

136.    To that end, NPS' conclusion that "[t]he free-ranging cat is an invasive species in any habitat" but fails to cite to any authority for that conclusion, does not identify any harm actually caused by the cats in the Paseo, and fails to demonstrate that any such harms outweigh the societal, cultural, and historical benefits of the cats. Nor does NPS acknowledge or address the fact that cats have been in Puerto Rico for centuries, long before Puerto Rico became a U.S. Territory and obviously long before the creation of the Paseo. Thus, NPS's designation of the community cats

---

[11] Available at
https://www.doi.gov/sites/doi.gov/files/uploads/isac_definitions_white_paper_rev.pdf (Last visited June 13, 2025).

in the Paseo as an invasive species is not legally sound.  However, even within the parameters of NPS' false conclusion, failure to consider a no-action alternative is not justifiable.

137.    At a minimum, NPS was required to demonstrate that community cats are *actually* contributing to or causing any of the hypothetical dangers it claims the cats *may* contribute to or cause in an EIS which measures any identifiable harm caused by community cats and evaluates measures to reduce those harms against the social and cultural harms that will result from those measures.

138.    Sixth, NPS failed to meaningfully address comments related to local laws in Puerto Rico that protect "stray animals."  *See e.g.* NPS_6317-6328; NPS_ (Correspondence ID: 485); NPS_ (Correspondence ID: 494); NPS_ (Correspondence ID: 496); NPS_ (Correspondence ID: 545).  While NPS recognized that commenters had raised issues, it dismissively noted that "if local laws are inconsistent with federal laws, [NPS] is required to follow federal laws on federal land." NPS_3625.

139.    However, as noted herein, the Paseo was constructed with funds from the Puerto Rico Tourism Company through a cooperative agreement, and remains managed (in part) by the PRTC under a cooperative agreement with NPS and thus is not solely subject to NPS oversight. NPS_3131, 3135, 3141.  NPS recognizes that for National Recreation Trails such as the Paseo, "there is no designated Federal oversight responsibility, investment, management, or other involvement beyond the designation recognition" and that the "program allows locally managed trails to be recognized for their contribution to the Nation's system of public trail access and outdoor enjoyment."[12]  Additionally, NPS failed to consider the compatibility of the 2023 Plan

---

[12] *See* https://www.nps.gov/subjects/nationaltrailssystem/national-recreation-trails-faqs.htm (Last visited June 13, 2025)

with local Puerto Rico law and existing MOUs governing the Paseo as required under Director's Order #45.

140.   NPS tries to avoid consideration of local San Juan and Puerto Rico laws governing the humane treatment of community cats by stating that it would require its selected animal welfare organization "to comply with these laws, when applicable." *Id.*; *see also* NPS_3630 (NPS will "strive" to be consistent with local laws).

141.   However, this is not what NEPA or the CEQ Regulations require.  NEPA requires agencies to consider and preserve "important historic, cultural, and natural aspects of our national heritage."  42 U.S.C. § 4331(b)(4).  The CEQ Regulations requires agencies, in considering the degree of effects and whether they are significant, to examine the "degree" of  "(i) both short- and long-term effects; (ii) beneficial and adverse effects; (iii) effects on public health and safety; and (iv) *effects that would violate Federal, State, Tribal, or local law protecting the environment*."  40 C.F.R. § 1501.3(b)(2) (emphasis added).

142.   Further, NPS' own regulations and Director's Order #45 require that NPS' administration of the Paseo can only proceed "the extent that such regulations are consistent with the" existing MOUs.  Director's Order #45 at Section 3.12 – Regulations.  Finally, because the Paseo is outside of the Park boundaries, federal law does not apply.

143.   Instead, NPS as much as admits that Puerto Rico's animal rights protection laws will be violated, but states it will only "strive" to be consistent with local laws.  As such, NPS failed to examine or quantify the "degree" of those effects whatsoever in violation of the CEQ Regulations.

## FIRST CLAIM FOR RELIEF

*Violation of the Administrative Procedure Act*

144.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

145.    NPS violated the APA, 5 U.S.C. §§ 551 *et seq.*, because its attempt to regulate the Paseo (and associated National Recreation Trail) is "not in accordance with law" and in excess of NPS' "statutory jurisdiction, authority, or limitations, or short of statutory right".  5 U.S.C. § 706(2)(A), (C).

146.    The 1949 Enactment setting the boundaries of the San Juan National Historic Site did not include the areas beyond the existing fortress walls.

147.    As such, NPS lacks the power or authority to regulate the Paseo as the Paseo is outside of the San Juan National Historic Site boundaries.

148.    Further, portions of the San Juan National Historic Site remain the property of Puerto Rico and are non-federal lands, and NPS' authority over such lands is applicable only to the extent compatible with the nonfederal interests of Puerto Rico.  36 C.R.F. § 1.2(b).

149.    As such, even for the portions of the Paseo within the San Juan National Historic Site (if any) but residing on non-federally owned lands, NPS lacks authority to regulate those lands without ensuring compatibility with Puerto Rico Laws.

150.    NPS's 2023 Plan is not in accordance with law, in excess of statutory jurisdiction, authority, or limitations and short of statutory right in violation of the APA, 5 U.S.C. § 706(2)(A).

## SECOND CLAIM FOR RELIEF

*Violation of the National Environmental Policy Act and the Administrative Procedure Act –
Inadequate Environmental Assessment and Finding of No Significant Impact*

151.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

152.    NPS violated NEPA, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, in preparing the 2023 EA and 2023 FONSI in several key ways.

153.    First, NPS violated NEPA by adopting an unduly narrow purpose and need which resulted in a flawed menu of alternatives and a premature FONSI that could only lead to the decision to end the TNR program at the Paseo.

154.    The EA incorporates a purpose and need statement which claims to focus on "protect[ing] park resources," "reduc[ing] impacts to native wildlife species associated with free-ranging cats," "alleviat[ing] nuisance issues and align[ing] the visitor experience with the purpose of the park," and "bring[ing] the park into compliance with existing authorities for invasive species." In truth, as demonstrated by NPS's response to comments received on its EA, "bring[ing] the park into compliance with existing authorities" consumes all other purposes and needs stated. NPS_3131. NPS's treatment of a range of feasible suggested alternatives makes clear that even if an alternative course of action could protect Park resources, reduce alleged impacts to wildlife, and alleviate any alleged "nuisance" issues, those alternatives were not and would not be considered if they did not "bring the park into compliance with existing authorities"—the same authorities that have existed for almost two decades.

155.    This also explains why NPS conducted no site-specific studies. NPS saw no need to establish that there was any harm actually being caused by the cats because the removal of the cats to bring the Park "into compliance" was a *fait accompli*.

44

156.    Instead, NPS' purpose and need statement necessarily and unreasonably constrained NPS' consideration of any alternative that would not accomplish a complete eradication of the cat population within the Paseo, and NPS has not demonstrated that the selected action responds to an actual need.

157.    Second, NPS violated NEPA by failing to take a "hard look" at reasonable alternatives in the 2023 EA and 2023 FONSI.  By artificially eliminating *any* TNR program from consideration through its narrow (and incorrect) purpose and need statement, NPS did not consider viable alternatives, including whether the no-action alternative with increased funding and support, or a modified, longer term TNR program with complementary management objectives such as community education on abandonment, could humanely and effectively address the community cat population on the Paseo.

158.    Third, NPS violated NEPA by failing to meaningfully address public comments identifying reasonably foreseeable impacts of the 2023 Plan.  NPS ignored comments pointing to scientific literature on the Vacuum Effect, failed to investigate reasons the existing TNR program had not resulted in a reduction of the cat population pointed out by public commenters, failed to address the likely reality that its chosen alternative would result in mass and continued killing of community cats, failed to conduct site specific studies on the actual current environmental impacts of the cats at the park, failed to assess the potential environmental impacts of increased rat populations at the park, and failed to assess the cultural and societal significance of the cats at the park as raised by public commenters and required by its own authorizing authorities for determining a proper management plan for exotic or invasive species.

159.    Fourth, NPS failed to address comments raising concerns about the 2023 Plan violating local laws and wholly failed to assess the degree to which the effect of any violation of

local laws was significant or compatible with those local laws.  NPS also failed to assess the existing MOUs between NPS and both SAG and the PRTC, requiring NPS to abide by those existing MOUs and coordinate with local authorities on the management of the Paseo as a National Recreation Trail.

160.    As such, NPS's 2023 Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF

*Violation of National Environmental Policy Act and the Administrative Procedure Act – Failure to Conduct an Environmental Impact Statement*

161.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

162.    NPS violated NEPA, 42 U.S.C. § 4321 *et seq.*, and NEPA's implementing regulations, by failing to conduct an EIS.

163.    First, the replete failures of NPS' 2023 EA and 2023 FONSI discussed above show that NPS failed to take a "hard look" at whether the 2023 Plan would have significant impacts that required an EIS, and NPS cannot make a convincing case for its finding of no significant impact.

164.    Second, NPS failed to adequately consider the significant historic, cultural, and societal effects of the 2023 Plan, which effects mandated an EIS.  42 U.S.C. § 4331(b)(4); *Semonite*, 916 F.3d at 1082.

165.    Third, NPS failed to address the significant scientific controversy raised in comments that cast substantial doubt on NPS's conclusions as to the effectiveness of TNR programs and the alleged harm from community cats' presence in the Paseo.

166.    Fourth, NPS failed to address comments raising concerns about the 2023 Plan violating local laws and wholly failed to assess the degree to which the effect of any violation of

local laws was significant or compatible with local laws, despite admitting that local laws would likely be violated. NPS also failed to assess the existing MOUs between NPS and both SAG and the PRTC, requiring NPS to abide by those existing MOUs and coordinate with local authorities on the management of the Paseo as a National Recreation Trail.

167.    As such, NPS's 2023 Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

### FOURTH CLAIM FOR RELIEF

*Violation of the Administrative Procedure Act*

168.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs into each of the counts set forth below.

169.    NPS violated the APA, 5 U.S.C. §§ 551 *et seq.*, by failing to provide a reasoned explanation for NPS' about-face from its decades-long administration and sanctioning of the TNR program at the Paseo.

170.    Further, NPS 2023 EA and 2023 FONSI implicate significant reliance interests for Plaintiff.  One of SAG's primary purposes as an organization to administer the TNR program at the Paseo, and this purpose will cease to exist if NPS's arbitrary and capricious decision to end the TNR program is allowed to stand.

171.    Rather than showing good reasons for its sudden decision to declare the TNR program noncompliant with its existing authorities, NPS simply claims the TNR program is no longer compliant with authorities that existed throughout the decades long TNR program.  NPS is required to do more and must provide "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *Fox Television Stations,* 556 U.S. at 502.

172.    As such, NPS's 2023 Plan is arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE,  Plaintiff  requests that this Court:

A.    Declare that Defendants lacked the authority to regulate the Paseo as outside the boundaries of the San Juan National Historic Site; and

B.    Vacate the Draft EA and 2023 FONSI as void, *ultra vires*, and beyond Defendants authority and jurisdiction;

Or alternatively,

C.    Declare that Defendants violated NEPA and the APA and that the Draft EA and 2023 FONSI were arbitrary and capricious, and contrary to law;

D.    Declare that Defendants violated NEPA and the APA by failing to prepare an EIS;

E.    Declare Defendants violated the APA by failing to provide a reasoned explanation for their change in position that the TNR program was not consistent with existing authorities;

F.    Enjoin Defendants from effectuating the preferred alternative of the Draft EA and 2023 FONSI;

G.    Order Defendants to prepare an EIS for the 2023 Plan;

H.    Grant Plaintiff its costs, expenses, attorneys' fees, and any other properly recoverable costs; and

I.    Grant such other and further relief as the Court may deem just, equitable and proper.

48

Dated: June 13, 2025

Respectfully submitted,

*s/ Eric P. Waeckerlin*
Eric P. Waeckerlin (977228)
Paul M. Seby *(Admission application pending and will move for pro hac vice status)*
Matthew K. Tieslau *(Admission application pending and will move for pro hac vice status)*
Greenberg Traurig, LLP
1144 15th Street, Suite 3300
Denver, CO 80202
(303) 572-6500 telephone
(303) 572-6540 facsimile
eric.waeckerlin@gtlaw.com
sebyp@gtlaw.com
tieslaum@gtlaw.com

*Attorneys for Plaintiff Save-A-Gato, Inc.*